UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUISE BLOUIN,<br><br>                    Plaintiff,<br>         v.<br><br>VANITY FAIR, CONDÉ NAST, MELANIE BONVICINO, JGB CAPITAL L.P., BAY POINT CAPITAL PARTNERS II L.P., and JOHN ALLERDING,<br><br>                    Defendants, | COMPLAINT<br>25-cv-_____- (    )<br><br>JURY TRIAL DEMANDED |

      Plaintiff Louise Blouin, by and through her undersigned counsel, for her Complaint against defendants Vanity Fair, Condé Nast, Melanie Bonvicino, JGB Capital L.P. ("JGB Capital"), Bay Point Capital Partners II L.P. ("Bay Point Capital"), and John Allerding (collectively, "defendants"), alleges as follows:

## PRELIMINARY STATEMENTS

      1.     This action arises from a series of knowingly false, defamatory, and malicious publications by *Vanity Fair*, a division of Condé Nast, which published an article on July 1, 2024, entitled *"How Art Mogul Louise Blouin Lost Her Fabled Hamptons Estate."*

      2.     The article falsely portrays Plaintiff Louise Blouin—an internationally recognized entrepreneur, publisher, and investor—as financially insolvent, personally bankrupt, and professionally discredited. It centers on the court-ordered sale of her La Dune estate in the Hamptons, but does so in a sensational and one-sided manner, suggesting Plaintiff has fallen from grace due to personal mismanagement, while ignoring material facts that had been provided to the reporter before publication.

1

3.      At the time of publication, Plaintiff had already provided Vanity Fair with extensive documentation, including verified court filings, financial records, and formal correction requests. These materials rebutted central claims in the article, including the false implication that Plaintiff had "lost" La Dune through irresponsibility rather than strategic litigation to fend off coercive creditors.

4.      Nonetheless, Vanity Fair proceeded with a reckless and sensationalist narrative built on the statements of conflicted sources—among them, a self-styled "consultant" under investigation for misconduct and individuals tied to predatory hard-money lenders seeking to coerce equity from Plaintiff's real estate assets. The article failed to disclose these sources' motives or the broader financial context, instead presenting their allegations as credible without independent corroboration.

5.      Defendant Condé Nast, through its editorial staff, approved and published inflammatory and misleading headlines, falsely suggesting Plaintiff's financial ruin and professional collapse, despite her documented success as founder and former CEO of Trader.com, her leadership in global arts philanthropy, and her record of profitable investments exceeding $200 million across the technology, media, and real estate sectors.

6.      These publications were disseminated internationally, including in Defendant Vanity Fair's French-language editions and across major digital platforms, and have caused severe reputational, financial, and emotional harm to Plaintiff, impairing her access to refinancing and disrupting ongoing litigation involving more than $67 million in contested interest and value.

7.      As a public figure, Plaintiff alleges that Vanity Fair and Condé Nast acted with actual malice—deliberately ignoring the truth, omitting exculpatory documents provided in

advance of publication, and instead relying on hostile sources including Bonvicino, who falsely claimed to represent Plaintiff, and actors tied to JGB Capital, Bay Point Capital, and their counsel, John Allerding.

## PARTIES

8. Plaintiff Louise Blouin is a Canadian businesswoman and international media entrepreneur, and the founder of Louise Blouin Media. She previously served as Chairman and CEO of Trader.com.

9. Defendant Vanity Fair is a business unit of Condé Nast with its principal place of business in New York, New York.

10. Defendant Condé Nast is a media company incorporated in and with its principal place of business in New York, New York.

11. Defendant Melanie Bonvicino is a natural person who resides in New York.

12. Defendant JGB Capital is, upon information and belief, a Connecticut corporation with its principal place of business in Westport, Connecticut.

13. Defendant Bay Point Capital Partners II, L.P. is a Delaware limited partnership with its principal place of business in Atlanta, Georgia.

14. Defendant John Allerding is a natural person domiciled in Ohio, and at all relevant times was affiliated with Bay Point Capital.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because Plaintiff is a citizen of a foreign state and none of the defendants are citizens of the same foreign state. The amount in controversy exceeds $75,000, exclusive of interest and costs.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (2) because at least one defendant resides in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District. The defamatory articles were written, edited, and published in New York County; the reputational and professional harm to Plaintiff was sustained in New York; and relevant witnesses and documents are located within this District.

## FACTUAL BACKGROUND

<u>Vanity Fair's False and Misleading Publications</u>

17. On July 1, 2024, Defendant Vanity Fair published an article titled "How Art Mogul Louise Blouin Lost Her Fabled Hamptons Estate" across its U.S. print edition, website, and affiliated social media channels.

18. The article, approved for publication by Condé Nast's editorial staff, framed Plaintiff as a socialite who had fallen into financial ruin, stating that she "lost" her historic Southampton estate and comparing her to "Trump" in connection with bankruptcy filings.

19. The article also stated, "Like Trump, Blouin has never filed for personal bankruptcy," a phrase that, though technically true, was used in a misleading way to imply the opposite. It falsely suggested that Plaintiff had been financially reckless and was only narrowly avoiding personal bankruptcy.

20. In truth, the Chapter 11 proceedings referenced in the article were filed by Plaintiff's affiliated corporate entities—Brickchurch Enterprises, Inc. and Aberdeen Enterprises, Inc.—and not by Plaintiff personally.

21. The proceedings were commenced as a lawful measure to resolve disputed liens, protect equity from coercive lenders, and implement a court-approved refinancing package.

22. The article also quoted anonymous sources implying Plaintiff had lived "above her means" and that her estate resembled "Grey Gardens," suggesting disrepair, delusion, and social decline.

23. In fact, the estate had been appraised by UBS Bank and Vanderbilt Appraisers at significantly higher values and was voluntarily sold through Concierge Auctions without any foreclosure judgment or forced auction.

24. Vanity Fair failed to publish or even reference the substantial factual record in Plaintiff's favor, including (1) the full court docket showing all claims were corporate and not personal, (2) proof of over $26 million in equity withdrawn before sale, and (3) evidence that the Chapter 11 plan was confirmed and all debts satisfied.

25. The French edition of Vanity Fair, published on or around September 21, 2024, ran a translated version titled "La chute d'une mondaine" (translated as "The Fall of a Socialite"), explicitly branding Plaintiff as a socialite in decline and reinforcing the defamatory theme of financial collapse.

26. These statements were disseminated internationally and widely circulated online. Vanity Fair and Condé Nast never contacted Plaintiff for final comment or fact-checking before publication.

27. When presented with corrections and supporting records in advance of publication—including closing statements, refinance term sheets, and court transcripts—Vanity Fair and Condé Nast declined to verify basic facts concerning the ownership structure, court record, or the nature of the underlying financial disputes.

Reliance on False, Unauthorized, and Conflicted Sources

28. The July 1, 2024, article repeatedly referenced commentary from Melanie Bonvicino.

29. Plaintiff is informed and believes, and thereupon alleges, that Defendant Melanie Bonvicino has a history of personal and professional conflict with Plaintiff, including unauthorized access to Plaintiff's residence and the dissemination of misleading statements to media sources while falsely claiming to represent Plaintiff.

30. At the time of publication, Vanity Fair and Condé Nast had been notified in writing by Plaintiff's legal team that Bonvicino was not authorized to speak on Plaintiff's behalf and had previously been directed to cease misrepresenting her affiliation.

31. Despite this, Condé Nast approved her inclusion in the article without disclosure of her adversarial status or source unreliability.

32. In addition to Bonvicino, Vanity Fair and Condé Nast relied on background information and statements from individuals associated with Defendant JGB Capital and Defendant Bay Point Capital—two lending entities involved in ongoing litigation against Plaintiff concerning the La Dune estate.

33. At the time of publication, both JGB Capital and Bay Point Capital were named parties in proceedings involving allegations of predatory and usurious lending practices, including claimed interest rates of 40% to over 100% and coercive efforts to obtain equity from Plaintiff's property holdings.

34. Defendant John Allerding, an attorney who represented Bay Point Capital during the foreclosure and Chapter 11 proceedings, was actively involved in the disputed transactions concerning Plaintiff and made on-the-record statements to Vanity Fair that reinforced the article's

defamatory narrative. The article failed to disclose that Allerding was counsel to an adverse party with a direct financial interest in the outcome.

35. Vanity Fair and Condé Nast failed to disclose these individuals' and entities' adversarial posture or financial motives. The article presented their views as disinterested third-party observations rather than contested allegations from parties with a direct stake in the outcome of the La Dune proceedings.

36. Prior to publication, Plaintiff's legal team submitted written objections alerting Condé Nast and Vanity Fair to the ongoing litigation with JGB Capital and Bay Point Capital, and to the reputational motives of Defendant Bonvicino. Nonetheless, Condé Nast approved publication of the article without performing independent verification of the claims or including any disclaimer about the sources' credibility, litigation posture, or prior misconduct.

<u>Harm to Plaintiff's Reputation, Business, and Litigation Position</u>

37. The publication and wide dissemination of the July 1, 2024 article by Defendant Vanity Fair, under the authority and approval of Defendant Condé Nast, caused immediate and measurable reputational harm to Plaintiff Louise Blouin.

38. Within days of publication, a private equity consortium based in New York and a family office in London both withdrew from active financing discussions concerning Plaintiff's real estate holdings. The respective principals of those firms specifically cited reputational risk arising from the Vanity Fair article as their reason for disengagement.

39. The defamatory article was also cited by opposing parties in active litigation involving Plaintiff. In active bankruptcy proceedings involving Plaintiff's affiliated entities,

opposing parties cited the Vanity Fair article as evidence of "public concern" in an effort to cast doubt on Plaintiff's financial credibility and professional conduct[1].

40. Plaintiff's professional and philanthropic engagements also suffered material setbacks. Following the article's publication, a major international art institution suspended planned negotiations regarding a joint cultural initiative involving Plaintiff.

41. In addition, a United Nations–affiliated non-governmental organization deferred a previously confirmed speaking engagement in New York, citing reputational uncertainty stemming from recent media coverage on Plaintiff.

42. These implications—falsely advanced by Vanity Fair and Condé Nast—that Plaintiff had declared personal bankruptcy, defaulted on her home, or engaged in questionable financial dealings, caused concrete disruption to Plaintiff's efforts to divest select real estate assets in a controlled manner and defend against coercive tactics by private lenders.

43. The resulting harms have directly impaired Plaintiff's ongoing legal posture in multimillion-dollar proceedings still active in both state and federal courts.

## CLAIMS

### 1. First Claim

### Defamation Per Se

### (Against Defendants Condé Nast and Vanity Fair)

44. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

---

[1] See *In re Brickchurch Enterprises, Inc.*, Nos. 22-70914 & 23-72834 (Bankr. E.D.N.Y.) (jointly administered).

45. Defendant Vanity Fair, under the ownership and editorial control of Defendant Condé Nast, published materially false and defamatory statements concerning Plaintiff Louise Blouin in the July 1, 2024 article titled "How Art Mogul Louise Blouin Lost Her Fabled Hamptons Estate," and in the September 21, 2024 French edition titled "La chute d'une mondaine."

46. These statements included false implications that Plaintiff filed for personal bankruptcy, defaulted on her home, and misrepresented her financial position.

47. These statements were published as fact, not opinion, and were reasonably understood by readers to convey factual assertions about Plaintiff's integrity, solvency, and competence.

48. The statements are defamatory per se under New York law in that they impute insolvency, fraud, and professional misconduct to Plaintiff; tend to expose Plaintiff to public contempt and ridicule; and injure Plaintiff in her trade, business, or profession.

49. Plaintiff did not file for personal bankruptcy; her corporate entities filed lawful Chapter 11 petitions, and all debts were satisfied under a confirmed plan. The sale of her property was voluntary, not the result of foreclosure.

50. As a direct and proximate result, Plaintiff suffered reputational damage, lost business opportunities, and disruption to ongoing litigation and investment efforts.

## 2. Second Claim

## Defamation with Actual Malice

### (Against Defendants Condé Nast and Vanity Fair)

51. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

9

52. Plaintiff is a public figure by virtue of her longstanding prominence in media, real estate, arts philanthropy, and international business.

53. As media defendants publishing about a public figure, Condé Nast and Vanity Fair bore a duty to avoid disseminating materially false statements with actual malice.

54. Yet, they acted with actual malice by knowingly disregarding the truth in multiple ways.

55. Defendants acted with actual malice by publishing the articles despite receiving advance corrections and supporting documentation, relying on hostile and unauthorized sources such as Defendant Melanie Bonvicino despite written warnings, quoting adversarial parties in ongoing litigation without disclosing their financial and reputational conflicts, and disregarding verified records showing that Plaintiff's corporate filings were part of a strategic restructuring— not evidence of Plaintiff's personal financial distress.

56. The decision to frame Plaintiff as bankrupt, irresponsible, and socially disgraced, despite knowledge to the contrary, demonstrates reckless disregard for the truth.

57. As a direct and proximate result, Plaintiff suffered measurable injury, including reputational damage, withdrawal of business support, litigation prejudice, and loss of goodwill.

### 3. Third Claim

### Invasion of Privacy

### (Against Defendants Condé Nast and Vanity Fair)

58. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

59. Defendants published content that portrayed Plaintiff in a false light by selectively omitting context, exaggerating controversy, and framing Plaintiff as an irresponsible socialite who had suffered financial collapse.

60. This false portrayal was highly offensive to a reasonable person and intentionally distorted Plaintiff's identity and career accomplishments for sensationalistic effect.

61. The article implied mental instability and decline by referencing "Grey Gardens," a cultural symbol of delusion and social deterioration.

62. These portrayals distorted Plaintiff's professional identity and omitted key facts about her business record, including her role in leading a $200 million portfolio in publishing, technology, and real estate investments.

63. The false light portrayal was distributed broadly through digital channels, social media, and international syndication, including Vanity Fair's French edition.

64. As a direct and proximate result, Plaintiff suffered reputational injury, emotional distress, and loss of professional and business opportunities.

### 4.  Fourth Claim

### Tortious Interference with Prospective Economic Advantage

### (Against Defendants Condé Nast, Vanity Fair, and Melanie Bonvicino)

65. Plaintiff realleges and incorporates by reference the preceding paragraphs as if fully set forth herein.

66. Prior to publication, Plaintiff was actively engaged in discussions with multiple parties regarding real estate transactions, refinancing, and the formation of a high-end real estate investment fund.

67. Defendant Condé Nast, acting through Vanity Fair, knowingly published false and disparaging claims that interfered with these prospective relationships.

68. Defendant Bonvicino provided false and unauthorized statements to Vanity Fair despite knowing they would be published, and despite having been expressly instructed not to represent Plaintiff. Bonvicino acted with the intent to damage Plaintiff's position in ongoing transactions and litigation.

69. Defendants' wrongful conduct directly caused one or more financing counterparties to withdraw from negotiations and harmed Plaintiff's ability to secure support for pending business ventures.

70. As a direct and proximate result, Plaintiff suffered financial loss and business disruption.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in its favor and against Defendants jointly and severally on all claims, as follows:

(a) On the First Claim (Defamation Per Se), award compensatory damages in an amount to be determined at trial, but not less than $5,000,000;

(b) On the Second Claim (Defamation with Actual Malice), award compensatory damages in an amount to be determined at trial, but not less than $5,000,000, plus punitive damages for willful and malicious publication of knowingly false and disparaging statements;

(c) On the Third Claim (False Light Invasion of Privacy), award compensatory damages in an amount to be determined at trial, but not less than $2,500,000, for emotional distress, reputational harm, and loss of professional standing;

(d)     On the Fourth Claim (Tortious Interference with Prospective Economic Advantage), award compensatory damages in an amount to be determined at trial, but not less than $7,500,000, including damages tied to lost refinancing, canceled partnerships, and disrupted investment negotiations;

(e)     Award punitive damages in an amount to be determined at trial, but not less than $5,000,000, against all Defendants, including Defendants Condé Nast, Vanity Fair, and Melanie Bonvicino, for knowingly malicious and retaliatory conduct carried out without privilege or justification

(f)     Award equitable relief, including an order requiring Defendants Condé Nast and Vanity Fair to:

    a. Retract and remove the July 1, 2024 and September 21, 2024 articles from Vanity Fair's websites, digital archives, and affiliated channels;

    b. Publish a correction or clarification acknowledging the misstatements concerning Plaintiff's financial status and court proceedings;

    c. Refrain from further dissemination of the defamatory content or misleading republication thereof;

(g)     Award attorneys' fees and costs, including under New York Civil Rights Law § 76-a and any other applicable statutory or equitable basis;

(h)     Award pre-judgment and post-judgment interest as permitted by law;

(i)     Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

69.     Plaintiff demands a trial by jury on all issues so triable.

Dated: June 30, 2025
New York, New York

        By: <u>*/s/* Robert Hantman</u>
Robert J. Hantman, Esq.
Attorney Bar Code: RH3947
HANTMAN & ASSOCIATES
www.hantmanlaw.com
1120 Avenue of the Americas 4th Floor
New York, NY 10036
Tel: (212) 684-3933
Fax: (646) 380-3299
rhantman@hantmanlaw.com
*Attorney for Plaintiff*